## ATCHISON, T. & S. F. RY. CO. v. SIMMONS.

### No. 3189.

Circuit Court of Appeals, Tenth Circuit.

Jan. 12, 1946.

E. C. Iden, of Albuquerque, N. M. (B. G. Johnson and James T. Paulantis, both of Albuquerque, N. M., on the brief), for appellant.

H. A. Kiker, of Santa Fe, N. M. (Hildebrand, Bills & McLeod, of Los Angeles, Cal., and Louis H. Brownstone, of San Francisco, Cal., on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

Simmons recovered a judgment against the Atchison, Topeka and Santa Fe Railway Company [1] for personal injuries under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The Railway Company has appealed.

The Railway Company is engaged in railway transportation, both in intrastate and interstate commerce. Simmons was employed as head brakeman on Extra Freight Train No. 5004, running east from Vaughn to Clovis, New Mexico. The train was derailed at 8:30 p. m., September 19, 1941, on what is known as the Belen Cut-Off, a short distance east of Buchanan, New Mexico. Buchanan is about 100 miles west of Clovis, New Mexico. The train consisted of 102 cars and a caboose and engine. The locomotive was 98 feet in length and is the largest type of engine employed in freight service by the Railway Company. The engine weighed approximately 450,-000 pounds. At the time of the derailment, the train was moving at 45 or 50 miles per hour. At the point where the derailment occurred, there was approximately a two per cent curve. The elevation of the north rail was four inches higher than the south rail. The train passed over a highway crossing 12 to 16 feet in length. The north rail at the center of the crossing was 5/32 of an inch lower than it was 19 feet and 6 inches in each direction from the center. The engine was inspected at Vaughn by the roundhouse foreman, at about 7:20 p. m., September 19, 1941. The inspection disclosed that the flange on the left front driver wheel was dry and was cutting.

The first warning that the engineer had that something was wrong was a few sparks coming from the left front driver and cylinder of the engine when the engine had passed about a car length over the crossing. When the engineer noticed the sparks, he applied the brakes in service position. After moving four or five car lengths forward, he realized that something more serious was wrong and immediately put the brakes into emergency. About 960 feet east of the crossing, there is a turnout switch, and when the engine reached the turnout switch it followed the switch, causing the engine and train to derail. After derailing at the switch, the engine continued a distance of some 350 feet to a point 20 or 30 feet north of the main track where it came to rest in an upright position. There were pieces of caliche rock on the crossing. The largest pieces were the size of a man's fist. Caliche is a very soft rock. There was powdered caliche rock on the top of the north rail about three or four feet from the west end of the crossing. About six or eight inches east of the powdered rock, there was a flange mark on the north rail which extended easterly 10 to 12 feet, indicating that one of the wheels of the engine had ridden on top of the rail for that distance. Beyond the flange mark, there were wheel marks outside the north rail on the end of the ties extending to the turnout switch. Caliche rock was packed between the north rail and the crossing plank next to such rail, at a point about four feet from the west end of the crossing. The flange mark on the north rail commenced about one or two feet east of where the caliche rock was packed in the flangeway.

An inspector for the Bureau of Safety for the Interstate Commerce Commission made an inspection of the derailment on September 21, 1941. The flanges of the driver wheels on the engine were inspected after the accident and none of them would take a one-inch gauge. The flange has to be less than one inch thick to take a one-inch gauge. A flange which will not take a one-inch gauge is within the allowable width under the rules of the Interstate Commerce Commission. After the engine had been placed back on the rails and moved to the shops at Albuquerque, New Mexico, a distance of 170 miles, it was found that the flange on the left front driver wheel would take a 15/16-inch gauge for a distance of 10½ inches. Under the rules of the Interstate Commerce Commission, a flange that will take a 15/16-inch gauge is defective.

The inspector packed caliche rock between the north rail and the adjacent plank and ran the wrecking derrick over it. The packed caliche rock did not raise the wheels from the rail.

Passenger Train No. 23 of the Railway Company, running from Clovis to Belen, passed over the crossing on September 19, 1941, at about 6:23 p. m., to 6:25 p. m., traveling at a speed of about 45 miles per hour. Neither the conductor nor the engineer on train No. 23 noticed anything

---

[1] Hereinafter called the Railway Company.

wrong at the crossing or any roughness or swing of the train as it passed over the crossing.

The railway company introduced expert testimony to the effect that the caliche rock caused the derailment. The plaintiff introduced expert testimony, by experienced railway engineers, to the effect that caliche rock could not have caused the accident.

At the close of the evidence, the Railway Company moved for a directed verdict. The trial court denied the motion. It gave an instruction on the doctrine of res ipsa loquitur. It submitted a general verdict and also the following special interrogatory: "Was the accident which resulted in plaintiff's injury caused by a rock or rocks on defendant's track at or near the road crossing?" The jury answered the special interrogatory in the negative and returned a verdict in favor of Simmons.

Under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, the Railway Company was liable if the injuries resulted, in whole or in part, from the negligence of any of the officers, agents, or employees of the Railway Company, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, tracks, roadbed, or other equipment.

The rule of res ipsa loquitur is applicable when, as in the instant case, the thing which caused the injury was, at the time of the injury, under the exclusive control of the defendant, and the occurrence was one which, in the ordinary course of things, does not happen if the one having such exclusive control uses proper care.[2] It creates an inference of fact. It casts on the opposite party the duty of going forward with evidence or risking that the jury will infer negligence from the occurrence. It will take the case to the jury unless the entire evidence is such that the presumption cannot stand against it. It is not enough that the evidence of the defendant would, if true, be sufficient to rebut the presumption, because it is for the jury to pass upon the credibility of the witnesses and the truth of the testimony. To justify a directed verdict, the evidence must be so conclusive that the minds of reasonable men could not differ as to the conclusions to be drawn therefrom.[3]

Caliche rock is very soft and normally flattens out when the weight of an engine passes over it. An experiment disclosed that caliche rock packed between the north rail and the adjacent crossing plank would not raise the wheels of an engine from the rail. There was an issue under the expert testimony as to whether caliche rock could have caused the derailment. There was evidence that the left front driver wheel was dry, was wearing, and was approaching the minimum allowable thickness under the rules of the Interstate Commerce Commission, and that such defect was known to an agent of the Railway Company prior to the accident. In this posture of the evidence, we think impartial and honest men might reasonably differ on the question of whether the caliche rock caused the derailment; and that they might reasonably conclude, under all the evidence and the inferences to be drawn therefrom, that the derailment was caused by the negligence of the Railway Company.

One question remains. It is urged that the trial court erred in admitting the testimony of expert witnesses, George Gunter and John R. Tipton, to the effect that in their opinion the caliche rock could not have caused the derailment. Tipton was a retired locomotive engineer. He worked for the Railway Company from 1899 until 1941 in engine service. He had run over the Belen Cut-Off. At times his engine ran over rocks deposited on the rails. He was familiar with caliche rock and the conditions at the place of the derailment. Gunter was a locomotive engineer employed by the Railway Company since February, 1920. A part of his work was in freight service. He had operated engines of the class of the engine that was derailed. He was the engineer on the lo-

---

2 San Juan Light Co. v. Requena, 224 U.S. 89, 98, 32 S.Ct. 399, 56 L.Ed. 680; Ramsouer v. Midland Valley R. Co., 8 Cir., 135 F.2d 101, 106; Terminal R. Ass'n of St. Louis v. Staengel, 8 Cir., 122 F.2d 271, 273, 136 A.L.R. 789; Lowery v. Hocking Valley R. Co., 6 Cir., 60 F.2d 78, 79.

3 Terminal R. Ass'n of St. Louis v. Staengel, 8 Cir., 122 F.2d 271, 275, 136 A.L.R. 789, and cases there cited; May Department Stores Co. v. Bell, 8 Cir., 61 F.2d 830, 840; Central Surety & Insurance Corp. v. Murphy, 10 Cir., 103 F.2d 117, 119; Oklahoma Natural Gas Co. v. McKee, 10 Cir., 121 F.2d 583, 585.

comotive that handled the wrecker after the derailment and observed the conditions in and about the wreck. He had experienced numerous instances where his locomotive had run over rocks on the rails. We think both witnesses were qualified to express an opinion as to whether the caliche rock caused the derailment.

The judgment is affirmed.